**FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver of Golden Pacific National Bank, Plaintiff,**

v.

**KUANG HSUNG CHUANG, et al., Defendants.**

**No. 85 CIV. 7468 (SWK).**

United States District Court, S.D. New York.

May 9, 1988.

---

Kaye, Scholer, Fierman, Hays & Handler, New York City by Barry Wilmer, for plaintiff.

Damadeo & Demartin, Hicksville, N.Y., for defendants 67 Hudson Street Corp. and T & C Realty Co.

Donald R. Schechter, P.C., Forest Hills, N.Y., for defendants Nepz Progress Plastics, Inc., T & C Realty Co., Prospect Polymer, Inc., Chiu Sui Teng, and Ya Jung Teng, as administratrix of the decedent's estate of Chiu Sui Teng.

## MEMORANDUM OPINION AND ORDER

KRAM, District Judge.

The Federal Deposit Insurance Corporation ("FDIC") brings this action as receiver of the Golden Pacific National Bank ("Bank") in an attempt to recover assets from a variety of corporations and individuals who allegedly owe funds to the Bank either as borrowers or guarantors. Plaintiff has invoked this Court's jurisdiction pursuant to 12 U.S.C. § 1819 and 28 U.S.C. § 1345, and jurisdiction is not contested.

The FDIC has brought motions for summary judgment against a number of defendants in a piecemeal fashion. At the present time, the Court is considering plaintiff's motion against Nepz Progress Plastics, Inc. ("Nepz"), Chui Sui Teng ("Teng"), and Ya Jung Teng ("Ms. Teng"), the administratrix of Teng's estate, as well as plaintiff's motion against T & C Realty Company ("T & C"), Prospect Polymer, Inc. ("Prospect"), 67 Hudson Street Corp. ("67 Hudson St."), Teng and Ms. Teng, again as administratrix. Plaintiff has also moved for entry of final judgment pursuant to Fed.R.Civ.Pro. 54(b).

## BACKGROUND

The facts of this case revolve around the failure of a Chinatown bank, the Golden

Pacific National Bank, and the FDIC's efforts at recovering the Bank's assets pursuant to its statutory duties, *see* 12 U.S.C. §§ 1811, 1821(d). The FDIC was appointed receiver of the Bank on June 21, 1985 by the Comptroller of the Currency of the United States after the Bank was ordered closed.

### The Alleged Nepz Obligations

The FDIC has commenced this action against Nepz to secure payment of a draft ("Nepz Draft") made payable to the Bank in the amount of $821,641.47. The FDIC states that the Nepz draft is payable on demand, that demand has been made and that no payment has been received. Defendants do not dispute that this draft exists and that the specified amount is presently owing to the Bank. Affidavit of Ya Jung Teng ("Teng Aff."), at ¶¶ 3, 4.

The FDIC also seeks judgment against Teng and his estate on a Subordination Agreement and Guaranty ("Teng Guaranty Agreement") which he executed to guarantee payment of the Nepz Draft. The Teng Guaranty Agreement states that Teng unconditionally guaranteed the payment of all debts of Nepz to the Bank which existed at the time of execution or arising thereafter. Affidavit of Simon Levy, September 30, 1987 ("Levy Aff. I"), at ¶ 7 and Exhibit B. Teng has failed to pay any of Nepz's obligations under the Guaranty Agreement. Defendants do not dispute these facts, but argue that the Guaranty is invalid (1) because Teng did not understand its terms and (2) because at the time of execution Kuang Hsung Chuang ("Chuang") acted as Teng's lawyer, as partner in the underlying business transaction, and as president of the Bank. Teng Aff., at ¶¶ 6, 10, 11.

Teng served as president of both Nepz and Prospect. Prospect and 67 Hudson St.—a corporation founded by Chuang— formed the partnership known as T & C Realty in 1980. Teng Aff., at ¶ 5; Supplemental Affidavit of Ya Jung Teng ("Teng Supp."), at p. 2. Through a series of transactions, T & C gained ownership of the property at 67 Hudson Street, which was to be converted into condominiums and sold.[1] According to Ms. Teng, the proceeds of these sales were to be used to repay the various obligations owing to the Bank. Ms. Teng also argues that her husband did not understand that he was signing a guaranty for all of Nepz's present and future debts, but only thought he was signing a guarantee for $147,000 in relation to the purchase of real property at 67 Hudson Street in New York. Defendants' Memorandum of Law at p. 6. Defendants also claim that Chuang led Teng to believe that all loans could be repaid through the sale of condominiums alone. Teng Aff. at ¶ 9. Ms. Teng claims that while her husband spoke English fluently, he had some difficulty understanding complicated written English. *Id.* at ¶ 12. Ms. Teng states that Chuang and her husband were longtime friends, and as businessmen in the Chinese community, were accustomed to conducting their business orally. She states that Teng trusted Chuang and relied on his friendship and reputation in the community. *Id.* at ¶ 8.

### The Alleged T & C Obligations

The FDIC also seeks summary judgment against T & C, and its general partners Prospect and 67 Hudson St., under two promissory notes payable to the Bank in the amounts of $1,250,000 and $253,947.22, plus interest, late charges and attorneys fees. The FDIC again seeks judgment against Teng and his estate for these same amounts based on written guarantees. T & C executed a secured note ("Note") on August 18, 1982 for $1,250,000, through which T & C promised to repay the loan upon demand. Affidavit of Simon Levy, October 7, 1987 ("Levy Aff. II"), at ¶ 4 and Exhibit A. T & C, according to plaintiff, has failed to make any payments on the Note, despite demand for payment. On October 7, 1980, T & C executed another "Mortgage Note" in the amount of $350,000. Exh. B to Levy Aff. II. Plaintiff claims that $253,947.22 in principal is presently due and owing on this Mortgage Note. *Id.* at ¶¶ 6, 7.

---

1. Ms. Teng provides a fairly detailed history of the formation of the partnership and the acqui- sition of the property, though its relevance here is not exactly clear. *See* Teng Supp., at pp. 2—4.

Defendants do not dispute the existence of these financial obligations, though they dispute the actual amount owing. Defendants contend that both these notes have been satisfied by the sale of condominium units, though the Bank never provided defendants with a satisfaction. Teng Supp., at p. 7. Teng states that the $1.25 million Note was established as a fund against which T & C could pay construction costs. *Id.* at p. 5. The Bank advanced monies as needed, condominium units were constructed and as the units were sold in 1985 and thereafter, the Bank allegedly credited T & C's account with payments toward its total indebtedness. *Id.* at p. 6. Attached to Teng's Supplemental Affidavit are copies of T & C's checking account bank statements and copies of debtor memos which evidence "repayment" by T & C, though the memos do not specify what is being repaid. The debtor memos evidence repayment in the amount of approximately $2,000,000. Exhibit G1 to Teng Supp.[2]

Ms. Teng further states that T & C borrowed a total of $3,042,602.43, though she provides no evidence suggesting how she reached this figure. Teng Supp. at p. 6. Teng states that these bank statements and debit memos are the only documentation available to establish the repayment of the loans, since neither Chuang or the Bank provided any other documents. Teng Aff. at ¶ 6. Ms. Teng attributes this lack of documentation to the nature of business dealings in the Chinese community. *Id.* at ¶ 8.

Teng executed an "Unlimited Guaranty" through which he promised to pay T & C's obligations to the Bank when due. Levy Aff. II at ¶ 8 and Exh. C. Teng has not paid any of T & C's obligations to the Bank, despite demand. Again, defendants do not deny the existence of the guaranty, though they object to its enforceability for the general reasons stated above concerning Chuang's role in the transactions. Defendants also note that Chuang simultaneously acted as attorney for T & C, received broker's commissions for the sale of condominium units at 67 Hudson Street and served as president of the Bank, thereby rendering the transaction invalid. Teng Aff. at ¶ 6.

## DISCUSSION

### Standards for Summary Judgment

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c). In testing whether the movant has met this burden, the Court must resolve all ambiguities against the movant. *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1187 (2d Cir.1987) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Adickes v. S.H. Kress and Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). The movant may discharge this burden by demonstrating to the Court that there is an absence of evidence to support the non-moving party's case on which that party would have the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).[3]

---

**2.** Ms. Teng asserts that T & C repaid in this fashion a total of $2,290,000. Teng Supp. at p. 6. The copies of debtor memos indicate repayments in an amount totalling $1,570,000. The debits on T & C's checking statements total $2,240,000. *Id.* at Exh. G1. Since the copies are not all clear, it is difficult to see the dates on all the debtor memos, and not all of the dates correlate to the dates on the checking account statement.

**3.** The moving party may rely on the evidence in the record to point out the absence of genuine issues of material fact. *Celotex, supra,* 106 S.Ct. at 2553. The moving party does not have the burden of providing evidence to negate the non-moving party's claims. *Id.* As the Supreme Court recently noted, "whether the moving party accompanies its summary judgment motion with affidavits, the motion may, and should, be granted so long as whatever is before the court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.*

The non-moving party then has the burden of coming forward with "specific facts showing that there is a genuine issue for trial." Rule 56(e). The non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Speculation, conclusory allegations and mere denials are not enough to raise genuine issues of fact. To avoid summary judgment, the non-moving party must establish the existence of enough evidence such that a jury could return a verdict in its favor. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 247–51, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986) (interpreting the "genuineness" requirement).

The Nepz Draft

■ Summary judgment against Nepz is clearly indicated since defendants admit the existence and validity of the obligation. Nepz has made no payments of the Draft and has stated no defenses to the entry of judgment. In their memorandum of law, defendants' suggest that the Nepz Draft is tainted by the fact that Chuang was involved and because Teng did not understand English perfectly. The latter defense fails for the simple reason that Teng did not sign the Nepz draft. The first purported defense fails because defendants have not presented any facts to support their conclusion, at least as regards the corporate obligation. Accordingly, plaintiff's motion for summary judgment against Nepz is granted. The Court orders entry of a final judgment against Nepz in the amount of $821,641.47, plus interest, pursuant to the provisions of Rule 54(b).

The Teng Guaranty Agreement to the Nepz Draft

Defendants do not deny the existence of the Guaranty, the fact that none of the monies owed by the principal obligor, Nepz, have been paid, or the fact that neither Teng nor his estate has made any payments on this obligation. Defendants argue, however, that the Guaranty should not be enforced because (1) Chuang misrepresented the nature of the obligations to Teng, (2) Chuang had a conflict of interest which tainted the transaction, and (3) Nepz is entitled to a set-off in the amount of $292,000 as a result of alleged loans to defendant T & C.[4]

Conflict of Interest

■ Defendants' "conflict of interest" defense fails for failure to identify any harm suffered by the alleged conflicts. Defendants rely on *Croce v. Kurnit*, 565 F.Supp. 884 (S.D.N.Y.1982), *aff'd*, 737 F.2d 229 (2d Cir.1984), in support of their argument that the Guaranty is not enforceable because Chuang sat on both sides of the transaction. While Chuang's conduct, as alleged, is reprehensible, it does not necessarily relieve Teng's estate of its financial obligations. In *Croce*, the Court held that defendant, a lawyer, had a fiduciary relationship with plaintiff at the time defendant explained the nature of certain contracts to plaintiff. *Id.* at 891. The lawyer breached that duty by not advising the Croces to retain independent counsel and by proceeding to explain the legal significance of contracts to which defendant was also a party. *Id.*

■ Assuming that Chuang breached fiduciary duties owed to Teng in relation to the execution of the Guaranty, rescission of his basic obligation to repay is inappropriate. In *Croce*, despite the Court's holding that the defendant had breached his fiduciary duty to plaintiffs, the Court found rescission inappropriate. While defendants have not asked for a "rescission" *per se*, they are asking the Court not to enforce the clear provisions of the Guaranty. As in *Croce*, defendants have received the benefit of the Guaranty: the Bank loaned Nepz,

---

4. Defendants do not actually argue this point as a defense in their memorandum of law, though Ms. Teng in her affidavit states at various points that Nepz should be able to recover against T & C for monies lent. As plaintiff asserts, nothing in the "at sight" draft provides any right for set-offs. Nor have defendants provided any legal basis or theory for their argument, except perhaps that Teng had an understanding with Chuang that Nepz could seek a set-off against T & C. If the latter is the case, the argument fails against the FDIC for the reasons stated below.

of which Teng was president, over $800,-000. Having received the benefit of the bargain, Ms. Teng now seeks to avoid the obligations of the Guaranty. While Chuang's conflicts of interest may have been unethical or illegal, the breach of Chuang's duties to Teng do not warrant the relief defendants now seek. *See Canfield v. Reynolds*, 631 F.2d 169, 178 (2d Cir.1980) (rescission not warranted where breach did not go to root of the contract). Defendants have not indicated any harm suffered by virtue of Chuang's alleged conflicts of interest. This Court thus holds that the presence of an attorney on both sides of a transaction who acts as a general counsellor to one of the parties, without more, does not necessarily invalidate the clear obligations of the parties evidenced by a written agreement when the party raising the defense has received the benefits of the bargain.

### Misrepresentations as to the Nature of the Obligation

Defendants argue that Teng and his estate should not be bound by the facial terms of the Guaranty since he did not know what he was signing and since Chuang had represented to Teng that he did not need to make any payments until all the condominium units at 67 Hudson Street had been sold. Defendants also argue that Teng thought he was only obligated to repay $147,000 in any event. Defendants rely on *National Bank of N. America v. Chu*, 64 A.D.2d 573, 407 N.Y.S.2d 43 (1st Dept.1978), *rev'd*, 47 N.Y.2d 946, 419 N.Y.S.2d 970, 393 N.E.2d 1042 (1979) (adopting the dissent of the Appellate Division), for the proposition that the Guaranty should not be enforced against Teng.

In *Chu*, the dissent, adopted by the Court of Appeals, did not enforce a guaranty against the defendant because the de-fendant had declared that he was misled as to the basic nature of what he was signing. 407 N.Y.S.2d at 46. Although he signed a guaranty which obligated him to repay certain loans, Chu—who claimed that he had limited reading ability in English—was led to believe that he was merely signing a form which authorized him to sign checks on behalf of a friend's corporation. That court specifically noted, however, that the facts of that case were distinguishable from ones

> in which defendant signed without reading an instrument that he knew imposed some liability on him and the general character of which he understood although he claims to have been misled as to the presence or meaning of particular provisions in the document. *Id.*

The other cases upon which defendants rely similarly concern persons who did not understand the essential nature of the document which they were signing. In *Briganti v. Saraceno*, 91 A.D.2d 648, 457 N.Y.S.2d 90 (2d Dept.1982), for example, the court decided that defendant had raised an issue of fraud sufficient to avoid specific performance by alleging that he was an 87-year old illiterate who was misled into signing a document which he did not know was a contract of sale for his home. Similarly, in *Pimpinello v. Swift & Co.*, 253 N.Y. 159, 170 N.E. 530 (1930), the leading case upon which the *Chu* court relied, the Court of Appeals refused to enforce the terms of a general release signed by plaintiff since plaintiff could not read or write English and since plaintiff's attorney had misled her to believe that she was signing a receipt for $750 received in partial satisfaction of a settlement.

Although the Court does not believe that Teng has established this purported defense since it is undisputed that Teng understood what he was signing,[5] the Court

---

5. Ms. Teng admits that her husband could read and speak English, but rests her defense on the assertion that Teng could not understand the fine points of the English language. Ms. Teng offers no support for her claim, other than her own assertion. Defendants do not deny that Teng, as president of Nepz and Polymer, and as a party to the acquisition of 67 Hudson Street and the sale of the condo units, understood the essential nature of the transaction, namely that the Bank was extending credit for the benefit of his business interests and that he was signing a guaranty on those loans. Indeed, Ms. Teng admits Teng knew the nature of the instrument he was signing. It is disingenuous for Ms. Teng

need not decide the question in light of the following discussion.

Validity of the Defenses against the FDIC

The FDIC relies on the *"D'Oench* doctrine" for the proposition that defendants' purported defenses are not available against the FDIC. *D'Oench, Duhme and Co., Inc. v. FDIC,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942).[6] In *D'Oench,* the Supreme Court held in a decision based on federal common law that an accommodation maker on a demand note could not raise lack of consideration as a defense against the FDIC since the note had been carried as an asset on the bank's books. *Id.* at 456, 62 S.Ct. at 678. The Court found it irrelevant that the petitioner did not intend to defraud the banking authorities, that he did not know his side agreement violated public policy or that no creditors were in fact defrauded. *Id.* at 461, 62 S.Ct. at 681. "Under this doctrine, the maker of a note may not plead various defenses against the FDIC, if in executing the note he lent himself to a scheme that would tend to mislead the banking authorities." *FDIC v. Berr,* 643 F.Supp. 357, 361 (D.Kan.1986) (citing *D'Oench, supra,* 315 U.S. at 458–60, 62 S.Ct. at 679–80). Any oral, collateral agreement which would serve to alter the facial terms of a security or loan document will generally be sufficient to "tend to deceive" the banking authorities and will not be valid as a defense against the FDIC.[7] *See FDIC v. Investors Associates X,* 775 F.2d 152, 156 (6th Cir. 1985) (defenses based on non-liability agreement and fraudulent inducement not valid); *FDIC v. Van Laanen,* 769 F.2d 666, 667 (10th Cir.1985) (defense based on side

agreement of no obligation on note not valid); *Berr, supra,* 643 F.Supp. at 361 (defense based on agreement to roll over the note and not to enforce it not valid); *FDIC v. MM & S Partners,* 626 F.Supp. 681, 687 (N.D.Ill.1985) (defenses based on waiver and estoppel).

█ Defendants claim that Teng had a collateral, unwritten and unannounced agreement that Teng would not have to pay more than $147,000 and that Chuang agreed to let Nepz have a $292,000 set-off against T & C. In each of these cases, the defense fails against the FDIC since the agreements would tend to deceive both the public and the banking authorities. In *Berr,* the Court rejected defendant's argument that the note in that case should not be enforced notwithstanding the facial terms since defendant had an understanding that he would not be personally liable on the note. 643 F.Supp. at 362. Ms. Teng cannot avoid liability on the similar theory that at the time Teng signed the Guaranty, he and Chuang had reached an agreement different from that stated on the face of the Guaranty. These defenses fail even though Teng may have acted in good faith, *MM & S Partners, supra,* 626 F.Supp. at 687, and without actual knowledge of the fraud on the banking system or any fraudulent intent, *Investors Associates X, supra,* 775 F.2d at 154.

Defendants argument that Chuang fraudulently induced Teng into executing the Guaranty is no more successful. The *Berr* court also rejected defendant's fraudulent inducement defense, holding that *"D'Oench* estops a maker from asserting any defense, including fraudulent induce-

---

now to claim that the monies received need not be repaid.

**6.** The FDIC has other shields based on statute and on federal common law. The statutory shield is based on 12 U.S.C. § 1823(e), which codified at least certain aspects of the *D'Oench* doctrine, *see generally FDIC v. MM & S Partners,* 626 F.Supp. 681, 684 & n. 2 (N.D.Ill.1985), and which bars any defense based on oral agreements that might impair the value of assets purchased by the FDIC. The second shield is based on "holder in due course" doctrine and would bar defenses against the FDIC if it pur-

chased assets for value in good faith without actual knowledge of the defense, *see Gunter v. Hutcheson,* 674 F.2d 862, 873 (11th Cir.1982) (applying federal common law). Since the FDIC has not argued or provided the factual basis necessary for these shields, the Court will not consider them.

**7.** Since the *D'Oench* doctrine is more encompassing than the parol evidence rule, the Court does not reach plaintiff's arguments that defendants could not present evidence of these defenses to alter the written terms of the Guaranty.

ment, that arises out of the deceptive scheme or arrangement." *Id.* at 363; *see also Investors Associates X,* 775 F.2d at 156 ("*D'Oench* estops the maker of a note from asserting any defense arising out of the fraudulent scheme, including representations made by another participant in the scheme.").

In sum, Teng lent himself to a scheme which tended to defraud the banking system by executing a Guaranty in favor of the Bank while relying on a collateral agreement or agreements that were different from the stated terms of the instrument. Although Teng may not have understood the fine points of English in the Guaranty, his estate is bound by its terms now that the FDIC seeks to recover the Bank's assets since he understood the nature of the transaction, had no lack of business experience and received the full benefit of his bargain. Accordingly, plaintiff's motion for summary judgment on the Guaranty is granted and entry of judgment pursuant to Rule 54(b) is ordered.

### The T & C Note and Mortgage Note

█ As stated earlier, defendants have the burden of establishing their defense with evidence sufficient for a reasonable trier of fact to return a verdict in their favor. Defendants admit that the Note and Mortgage Note were duly executed, but argue that the documents provided in Ms. Teng's Supplemental Affidavit raise genuine issues of material fact concerning repayment of the loans. These documents, described in detail above, are generally inconclusive, though they do establish that the Bank credited T & C for "repayment" of something.

Though the documents are confusing and may not in the final analysis prove anything, this Court believes summary judgment is not warranted on the question of the amount owing. On the other hand, the Court grants summary judgment as to the question of liability of T & C and its general partners. The Court will refer this mat-

ter to a Magistrate to conduct an inquest to determine the amount owing on these two notes.[8]

### The Teng Unlimited Guaranty on the T & C Notes

Defendants raise the same defenses to this guaranty as were raised with regard to the guaranty on the Nepz obligations. Ms. Teng admits that the Bank paid monies to T & C and that Teng executed the Unlimited Guaranty in consideration of these loans. Teng Supp. at pp. 4—6. In the context of the Unlimited Guaranty, Ms. Teng does not argue that her husband misunderstood the terms of the agreement, but does argue that the Unlimited Guaranty should not be enforced because it is tainted by Chuang's multiple involvement and because Teng had agreed with Chuang that no monies were to be due until all the condominium units had been sold, contrary to the terms of the written agreements. These defenses fail for the reasons enunciated above.

Ms. Teng does argue, however, that the monies owed to the Bank on these notes have been repaid, and that the obligation on the Unlimited Guaranty would thus be zero. While her premise is correct, she has not conclusively established how much was in fact borrowed or repaid, as discussed above. Consequently, plaintiff's motion for summary judgment is granted on the liability question, but denied on the question of the amount presently owing. As noted above, a Magistrate will conduct an inquest to determine the amount due, and Teng's estate will be liable for that amount.

### Conclusion

Plaintiff's motion for summary judgment is granted against Nepz, Teng and Ms. Teng, as administratrix, in the amount of $821,641.47, plus interest. Entry of final judgment is ordered pursuant to Rule 54(b). Plaintiff's motion for summary judgment against T & C, Prospect and 67 Hudson St., Teng and Ms. Teng as adminis-

---

**8.** Plaintiff urges the Court to order defendants to repay $716,796.73, plus interest. They reached this figure by subtracting the amount Ms. Teng says she has repaid, $2,290,000, from the amount she says was borrowed, $3,042,602.43. The Court is not inclined to do so since these figures are not supported by the facts before the Court.

tratrix is granted as to the question of liability, but denied as to the question of the amount presently owing. This Court will refer this matter to a Magistrate who will conduct an inquest to determine the amount presently owing.

SO ORDERED.